**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Carl Albert HIGGANS, Defendant-
Appellant.**

**No. 73–2006.**

United States Court of Appeals,
Seventh Circuit.

Argued April 23, 1974.

Decided Oct. 15, 1974.

As Amended Dec. 16, 1974.

James A. Walrath, James M. Shellow, Milwaukee, Wis., for defendant-appellant.

William J. Mulligan, U. S. Atty., and David B. Bukey, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before SWYGERT, Chief Judge, FAIRCHILD, Circuit Judge, and SOLOMON,* Senior District Judge.

PER CURIAM.

Carl Albert Higgans (appellant) appeals his jury conviction and sentence of eight years imprisonment for bank robbery.

We affirm the conviction and the sentence.

On October 31, 1972, at about 11:00 A.M., three armed black men robbed the University National Bank (the bank) in Milwaukee, Wisconsin, of more than $15,000.

The tallest robber, between 6' and 6'5" tall, gave the orders. A second robber, about 5'9", collected money from the tellers' drawers. The smallest robber, about 5'5", watched the front entrance. Each man wore a partial face mask, a cap or hat, and a jacket or topcoat. The tallest robber had a distinctive "heavy, high tone pitched voice."

One of the robbers appeared to drop something as he left the bank. The F. B.I. later found a pair of gold-rimmed sunglasses on the sidewalk outside the bank.

A passing motorist saw a tall, masked, black man, carrying a briefcase and a shotgun, running along the sidewalk. The motorist watched the man enter a nearby car in which there were two other black men. The motorist stopped when he saw a commotion at the bank. He gave the police the license number of the car and described the car as a 1964 white Chevrolet with a damaged front grille and fender. Later that day, the police found and stopped the car. It was occupied by Rudolph Willis, the car's owner, Michael Higgans, the appellant's brother, and a third man.

Immediately after the robbery, the F. B.I. showed black-and-white photographs of suspects to persons who witnessed the robbery. One witness thought the photograph of appellant resembled the tallest robber.

On December 21, 1972, the F.B.I., without a warrant, arrested appellant

---

* Senior District Judge Gus J. Solomon of the United States District Court of Oregon is sitting by designation.

and Paul Bowie for the robbery. Both men were photographed after the arrest. An F.B.I. agent testified that he heard appellant speak after the arrest and that appellant had a deep voice.

At trial, two witnesses to the bank robbery testified that appellant resembled the tallest robber, but they did not positively identify him as the robber. During the direct examination by the prosecutor, one of these witnesses testified that immediately after the robbery she told an F.B.I. agent that a black-and-white photograph of appellant resembled the tallest robber. The other witness testified that shortly before trial he was shown a group of color photographs which included the photograph of appellant taken after his arrest. The witness thought appellant's photograph resembled the tallest robber.

Paul Bowie's brother, Donald Bowie, testified about events in his apartment on the morning of the robbery. Paul Bowie, appellant and a third man had gone to Donald's apartment in the early morning hours of October 31, 1972, and had stayed in the apartment all night.

During the direct examination, the prosecutor, outside the presence of the jury, told the court he was surprised by Donald's testimony. The prosecutor said that, during an interview on the previous day, Donald gave him many specific details about events in his apartment on the morning of the robbery which Donald was now unable to remember. The court ruled that, because of Donald's sudden memory lapse and his relationship to Paul Bowie, Donald could be treated as a hostile witness and the prosecutor could ask leading questions.

The prosecutor, in the presence of the jury, asked Donald if he had told the F.B.I. that Paul Bowie and the appellant left his apartment at 9:30 A.M. and returned at 10:30 A.M. on the day of the robbery. Donald said he did not remember making that statement.

Donald testified that all three men left his apartment at about 10:30 A.M. At about 11:15 A.M. he heard loud banging on his door; he let the three men back into his apartment. He testified that they stayed for about ten minutes.

During this examination by the prosecutor, Donald denied that he had previously told the F.B.I. that he had disposed of some clothes left by his three visitors. He said that he had told the F.B.I. that the clothes he disposed of were his own clothes and not those of his visitors. Donald also denied telling the F.B.I. that the visitors had brought a .44 Colt Magnum pistol into his apartment. He said that he had told the F.B.I. he remembered seeing a toy gun in the apartment.

Donald denied that he told the F.B.I. that the gold-rimmed sunglasses belonged to appellant. He remembered only saying to the F.B.I. that he had seen appellant wearing sunglasses at some point. Donald also insisted that he did not tell his roommate that Paul had robbed the bank.

Donald also recalled that on the morning of the robbery he asked Paul what he was going to do that day. Paul answered that he was going to "hit a filling station". Donald then heard appellant laugh in the next room, but Donald did know know if the laughter was in response to Paul's answer.

Rudolph Willis, who owned the getaway car, testified that in a bar the night before the robbery a man named "Skip" asked to borrow Willis' car the next day.[1] Willis recalled that "Skip" resembled the appellant, but he testified that this man did not appear to be the appellant.

Willis testified that about 10 o'clock the following morning a man knocked at his door and asked to borrow his car. Willis said he did not open the door to see who was there, but he assumed it was the man with whom he had talked the previous night. Willis then testified

1. The appellant's nickname is "Skip".

that he told the man he could not have the car because it would not run.

The prosecutor, outside the presence of the jury, told the trial court that he was surprised by Willis' testimony. The prosecutor said that in a pretrial interview Willis told the F.B.I. that "Skip" Higgans was the man in the bar. The court ruled that Willis was a hostile witness.

After the jury returned, Willis denied he had told the F.B.I. that "Skip" Higgans was the man in the bar who asked to borrow his car.

A cab driver testified that at about 9:25 A.M. on October 31, 1972, he picked up two black men at Donald's address and took them to the vicinity of Willis' home. He was unable to identify the men at the trial.

A sanitation worker testified that at about 11:00 A.M. on October 31, 1972 (shortly after the robbery), he saw three black men get out of a white Chevrolet, with a damaged front, in the vicinity of Donald Bowie's apartment. He saw the men run up some stairs and then he heard pounding and rapping.

Lohman Brooks, Jr., of Los Angeles testified that in early November, 1972, he met appellant, Paul Bowie, and one other man near Los Angeles. He said that he went with three men to a used car dealer where they bought a $6,700 Cadillac. Appellant paid the $1,500 down payment in cash, but the title to the car was put in Brooks' name.

Appellant did not testify.

On this appeal the appellant asserts five errors.

1. Identification evidence was improperly admitted.

Two witnesses to the robbery testified that appellant resembled the tallest robber. Over appellant's objections, the court allowed the witnesses to testify that before the trial they told the F.B.I. that photographs of appellant resembled the tallest robber.

Appellant contends that these references to earlier "identifications" were improper. He argues that evidence of prior consistent statements by a witness is irrelevant, unless it is being used to rehabilitate an impeached witness.

The pretrial identifications were not irrelevant. The use of pretrial photographic identification to buttress in-court identification is a proper prosecutorial tactic. United States v. Hines, 470 F.2d 225, 228 (3rd Cir. 1972), cert. denied, 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973). " . . . '[T]he earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind.' " Gilbert v. California, 388 U.S. 263, 272–273 n. 3, 87 S.Ct. 1951, 1956–1957, 18 L.Ed.2d 1178 (1967), quoting from People v. Gould, 54 Cal.2d 621, 626, 7 Cal.Rptr. 273, 354 P.2d 865, 867 (1960). Evidence of pretrial identification is even more important when the trial takes place long after the crime was committed. United States v. Hines, supra, 470 F.2d at 228.

Here ten months elapsed between the robbery and the trial. Testimony on the pretrial photographic identifications was proper.

Appellant also argues that his identification through a photograph and a voice description obtained after his arrest should have been suppressed as the fruit of an unlawful arrest. On December 21, 1972, appellant and Paul Bowie were arrested without a warrant by F. B.I. agents. Appellant says that the evidence which was obtained following that warrantless arrest was not admissible without a showing that the arresting officers had probable cause to arrest. Appellant contends that there was no such showing here.

Before the arrest, a witness told the F.B.I. that appellant's photograph resembled the tallest bank robber. Another witness told the F.B.I. after the robbery that Paul Bowie, appellant's companion, resembled one of the robbers. Willis,

the owner of the getaway car, told the F.B.I. that a man named "Skip", who resembled appellant, asked to borrow his car on the morning of the robbery. Other circumstantial evidence pointed to appellant as a probable participant in the robbery. The motion to suppress was properly denied.

■ The appellant next argues that the trial court should have stricken testimony about photographs that were either not admitted or were stricken. If there was error in not striking the references, it was harmless beyond a reasonable doubt. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L. Ed.2d 284 (1969).

2. The government committed reversible error by the techniques used to impeach hostile witnesses.

■ During the direct examinations of Donald Bowie and Rudolph Willis, the prosecutor inferred that the witnesses had made pretrial statements contrary to their sworn testimony at trial. Appellant contends that this impeachment technique pitted the prosecutor's credibility and the prestige of his office against the witnesses' credibility. Appellant also asserts that the prosecutor referred to facts within his knowledge which were never introduced into evidence. These contentions have no merit.

Donald Bowie and Willis both testified under government subpoena and both were declared hostile witnesses. Both testified that they did not remember material links in the government's chain of circumstantial evidence. The government therefore sought to impeach the witnesses with their prior inconsistent statements made in interviews with F.B.I. agents and with the prosecutor.

After Donald Bowie and Willis testified, appellant's counsel stipulated with the prosecutor that these two witnesses had been impeached on the subject matter of the prosecutor's question which contained the "facts" about which appellant complains.

The stipulation made it unnecessary for the prosecutor to introduce impeachment evidence against Donald Bowie and Willis. Appellant entered into that stipulation to avoid the introduction of the damaging impeachment evidence and to limit his admissions to impeachment only.

At appellant's request, the trial court instructed the jury that impeachment of these two witnesses on certain matters did not necessarily mean that the opposite of the impeached testimony was true.

■ Prosecutors have a duty to avoid placing their own credibility in issue. United States v. Handman, 447 F.2d 853, 856 (7th Cir. 1971). Here, the stipulation that the witnesses had been impeached erased the issue of the prosecutor's credibility.

3. The government connected appellant to the robbery through the use of inadmissible circumstantial evidence.

Appellant contends the trial court erred in allowing evidence that after the bank robbery appellant made a trip to Los Angeles and there purchased a Cadillac. He argues that that evidence should not have been admitted without a showing that appellant was impecunious before the robbery.

■ Although relevant to the weight and value of the evidence, proof of prior impecunity is not necessary to admit evidence of unusual expenditures. Admission of this type of evidence is "entrusted primarily to the sound discretion of the trial court". United States v. Crisp, 435 F.2d 354, 360 (7th Cir. 1970), cert. denied, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); United States v. Brewer, 427 F.2d 409, 411–412 (10th Cir. 1970).

This view was not limited by United States v. Gornick, 448 F.2d 566, 571–572 (7th Cir. 1971), cert. denied, 404 U.S. 861, 92 S.Ct. 161, 30 L.Ed.2d 103 (1971). In that case evidence that the defendant had $357 in cash many hours after the bank robbery was deemed competent, even though the only evidence of

his previous financial condition was testimony that he " . . . found it necessary to cash his paycheck on the day of the bank robbery in the sum of $191 . . . ." *Id.*, 448 F.2d at 572.

■ We find that the trial judge here did not abuse his discretion by allowing the jury to decide what weight should be given the $1,500 cash payment by appellant for a Cadillac which was purchased in a city far away from appellant's home in the name of another person.

Appellant charges that other inadmissible evidence was admitted.

Donald Bowie testified that on the morning of the robbery he asked his brother Paul what he was doing that day and Paul replied he was going to "hit a filling station". Donald said that after Paul's statement, appellant, who was in the next room, laughed. Appellant contends that this was inadmissible hearsay evidence.

■ The government asserts that the testimony was not admitted to prove that appellant intended to rob a filling station, but as evidence of appellant's state of mind on the morning of the bank robbery. The trial court properly allowed the jury to decide what significance to give to this ambiguous evidence of appellant's laughter in response to Paul's statement. *See* Frank v. United States, 220 F.2d 559 (10th Cir. 1955).

■ Evidence that gold-rimmed sunglasses were found on the sidewalk near the bank was properly admitted. Donald Bowie testified he had seen appellant wearing sunglasses, and there was other evidence that one of the robbers appeared to drop something and that sunglasses were found at the spot. The trial court properly allowed the jury to decide what weight should be given to this evidence.

4. The government failed to prove that the bank was insured by the Federal Deposit Insurance Corporation at the time of the robbery.

■ Proof that the robbed bank was insured by the Federal Deposit Insurance Corporation (F.D.I.C.) is an essential fact. Scruggs v. United States, 450 F.2d 359, 360–361 (8th Cir. 1971), cert. denied, 405 U.S. 1071, 92 S.Ct. 1521, 31 L.Ed.2d 804 (1972). Some competent evidence of insurance must be adduced at trial to sustain a conviction. *See* King v. United States, 426 F.2d 278 (9th Cir. 1970).

The F.D.I.C. certificate of insurance was introduced through a bank vice president. That certificate proved the insured status of the bank on the date of the certificate, June 17, 1971. Appellant contends that the government failed to adduce evidence to prove that the bank's insurance was still in effect on the date of the robbery, about 16 months later. *See* United States v. Reed, 376 F.2d 226, 229 (7th Cir. 1967).

■ The bank vice president testified that all national banks have F.D.I.C. insurance, that the bank operated as a national bank, and that the bank regularly paid the F.D.I.C. premiums. He also testified that examiners assured him the bank was insured. We find ample evidence for the jury to find that the bank was insured on the date of the robbery.

5. The trial judge erred when he told the jury, outside the presence of either appellant or his counsel, that it could not have a transcript of the testimony.

After deliberating for several hours, the foreman of the jury sent the judge a message asking for a transcript of all the testimony. The judge denied the request without informing appellant or his counsel that the request had been made.

■ We recognize that Rule 43 of the Federal Rules of Criminal Procedure requires the presence of the defendant "at every stage of the trial". Here the ruling was obviously within the discretion of the trial judge, and the appellant has shown no prejudice. " . . . [A]n error does not require reversal . . . when the record shows with

reasonable certainty that it did not prejudice the defendant's substantial rights." Walker v. United States, 116 U.S.App. D.C. 22, 322 F.2d 434, 435 (1963); *see* United States v. Compagna, 146 F.2d 524, 528 (2d Cir. 1944), cert. denied, 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422, rehearing denied, 325 U.S. 892, 65 S.Ct. 1084, 89 L.Ed. 2004 (1945); and United States v. Freed, 460 F.2d 75, 78 (10th Cir. 1972).

This specification of error has no merit.

We have examined all the assignments of error, and we reject all of them. Appellant's conviction is affirmed.